E. M. OTT, AND J. W. RAY, D/B/A CRAWFORDSVILLE DEHYDRATOR COMPANY, A PARTNERSHIP *v.* WONDER STATE MANUFACTURING COMPANY

5-4551                                    427 S. W. 2d 20

Opinion delivered April 22, 1968

*Rieves & Rieves,* for appellants.

*Branch & Adair,* for appellee.

J. FRED JONES, Justice. E. M. Ott and J. W. Ray, as partners, doing business as Crawfordsville Dehydrator Company, brought suit in the Greene County Circuit Court against Wonder State Manufacturing Company for damages sustained by Ott and Ray because of the collapse of a grain bin they purchased from Wonder State. This appeal by Ott and Ray, is from a judgment entered on a jury verdict in favor of Wonder State.

The appellants, Ott and Ray, were engaged in the business of manufacturing alfalfa pellets, and the appellee, Wonder State Manufacturing Company, was engaged in manufacturing and selling metal seed houses or bins. In early 1965, the appellants purchased from the appellee two 46½ ton bins to be used for the purpose of storing the processed alfalfa pellets. These bins, when erected in single units, were ten by twelve feet in dimension with ten foot vertical side and end walls. The bottom of each bin or unit was of hopper like design in the form of an inverted pyramid and the entire unit was elevated on steel posts in such manner that trucks could be driven underneath for loading from the hopper. The two bins purchased by the appellants were put together in such manner that they actually constituted a single building or bin 12 feet wide and 20 feet long with two loading hoppers, one at each end. One bin was first erected without its north wall and the second bin, without a south wall, was added to the first bin on the north side of the first bin, thus constituting the single bin without a partition between the two units. This single bin with the two hoppers was supported on six steel posts set in concrete. The manufactured pellets were introduced into the bin by a pneumatic process through a

tube or pipe inserted through a hole that had been cut near the top or eave in the side of the second unit, or north portion of the bin. The pellets were then allowed to flow by gravity to the south and other portions of the bin. Appellants advised the appellee of the purpose for which the bins were being purchased and the appellee assured appellants that the bins were suitable for the intended use.

In June 1965, the northwest corner of the bin buckled, and the north hopper of the bin collapsed, under the weight of the pellet content and in appellants' suit for damages they allege the collapse was caused by the defendant in improperly designing the building for its intended use, and that such failure constituted a breach of warranty made by appellee to the appellants. Appellee answered by general and specific denials and alleged, among other things, that the collapse of the bin and hopper was caused by the appellants overloading it. There is no question that the collapse occurred because of the weight of the contents of the bin, so the actual question at the trial was whether the fault lay with the appellee in design, construction, or warranty, or whether the fault lay with the appellants in the use of the bin. On appeal to this court, the main question involves the sufficiency of the evidence, and about the only law involved in this case is the law of gravity.

Appellants designate two points upon which they rely for reversal, as follows:

"The court erred in permitting witness to testify, over appellant's objection, as to improper loading of bin.

The court erred in permitting the introduction of the testimony and the graphic illustration by appellee's expert witness, Tom Bailey, with reference to the maximum pile of alfalfa pellets which could be introduced into the seed house; and in failing to

strike the testimony of Tom Bailey at appellant's request.''

We find no merit in either of the points designated by appellants. From appellants' own evidence it is clear that three holes had been cut through the wall of the double unit bin for the purpose of introducing pellets into it. The first hole was approximately 44 inches from the bottom of the bin and from the top of the hopper portion of the bin. This hole was approximately 29 inches south of the center line of the bin and was over the north portion of the hopper constituting the bottom of the south unit of the bin. The second hole was of no significance, but the third hole, and the one being used for the introduction of pellets, was some 104 inches from the bottom of the bin and from the top of the hopper portion of the bin. This hole was approximately 44 inches north of the center line of the bin and was over the south portion of the hopper constituting the bottom of the north unit of the bin. At least 89.41 tons of the pellets had been blown into the north end of the bin through this third hole and these pellets were still in the bin when the north side of the bin and the north hopper collapsed. As to the weight of the pellets in the bin at the time of the collapse, appellant Ray testified as follows:

''Q. How much of it [alfalfa pellets] were you able to salvage?

A. I have got some tickets. We weighed it all. I believe, looks like 168,820 pounds.
          *     *     *
A. We estimated there was an additional five tons we couldn't recover.''

On cross-examination Mr. Ray testified:

''Q. Do you recall, offhand, the weight of the pellets that remained in the hopper that stayed up?

A. No, I do not. I recall, I was a little bit, amazed me, there were—I don't recall, exactly, I remember, more in there than I thought there would be.

* * *

Q. Do you have anything here you could look at to determine the weight of the pellets that remained in the hopper?

A. No, sir. I don't believe so.

Q. Do you recall, it was something between 19 and 20 ton?

A. No, sir. I don't recall, but it is possible that is right.

Q. The amount left in the hopper and that recovered from the ground together weighed 168,820 pounds, figure you testified to earlier?

A. Yes, sir. That is correct.

Q. And you and someone from Wonder State estimated there was about six tons that remained on the ground, could not be, be recovered?

A. I think we said five, five or six."

According to appellant's own testimony, when his lowest estimate of five tons of pellets that could not be salvaged is added to the amount that was salvaged and weighed, there was 89.41 tons of pellets in the entire bin when it collapsed. This was only 3.59 tons short of the weight both bins were designed to hold had they been erected as single and separate units. From appellant's own testimony, and that of his own witnesses, the entire bin would have reached its pellet weight content capacity of 93 tons when the pellets had reached a uni-

form depth throughout the bin up to the first hole that had been cut 44 inches from the bottom of the bin. There is no question that all the pellets in the bin had been blown into it through the hole near the top of the side of the north unit or end of the bin and allowed to simply flow by gravity to the other areas of the bin. Appellant testified that at the time the north end collapsed, the bin had not been filled to the first hole on the south side. So we conclude, that from appellant's own evidence and the undisputed physical facts deductible therefrom, the jury, by the application of its common sense to the laws of gravity, could have reasonably found that considerably more than 46½ tons of pellets was in the north end or unit of the bin when it collapsed, and that it was the excessive weight of these pellets that caused the north hopper and north end of the bin to collapse.

Appellee's witness, Tom Bailey, not only testified as a qualified expert in the construction and erection of the type of bins involved here, he testified that he went into the collapsed bin and observed the pellets that remained in the south end of the bin and in the south hopper. He testified that the southeast corner of this south hopper had not filled up. Bailey also testified that the angle of repose for alfalfa pellets was 25 degrees and from the angle of repose of the pellets he observed in the south and undisturbed end of the bin and hopper, he estimated the distribution of the contents between the north and south halves of the bin to be 40% in the south end and 60% in the north end at the time of the collapse.

The only evidence offered as to statements made in the nature of express warranties, pertained to statements that a single bin would hold 46½ tons of feathers and that the bins would be suitable for storing alfalfa pellets. It is obvious that the statement as to feathers simply meant that the bin could be completely filled with any substance so long as the total weight did not exceed 46½ tons. There is no evidence in the record that

the bins would not hold 46½ tons of feathers or anything else, including 46½ tons of alfalfa pellets. There is no evidence in the record that the bin was not suitable for storing alfalfa pellets, but there is substantial evidence in the record that appellants overloaded the north end of the bin with more than 46½ tons of alfalfa pellets and that the north end of the bin collapsed under this weight. Many automobiles are designed as eight passenger automobiles and are sold as being suitable for safely transporting people, but certainly there is no warranty in the sale of such automobile that eight people can ride safely in the front seat. There is substantial evidence in the record to sustain the verdict of the jury, and finding no error in the admission of the evidence, we affirm the judgment of the trial court.

Affirmed.

FOGLEMAN, J., not participating.